**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SELENA E. MOLINA
SENIOR MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

October 10, 2025

Teresa Robinson
1041 Tremont Drive
Glenolden, PA 19036

Danielle Whitaker
144 W. 21st Street
Chester, PA 19013

Paul Whitaker
1021 Washington Avenue
Marcus Hook, PA 19061

Jone Posey
11 Belvue Terrace
Aston, PA 19014

> Re: *IMO the Estate of Joseph L. Weddington, Jr., deceased*,
> C.A. No. 2021-0951-SEM

Dear Parties:

This estate action was filed nearly four years ago. It is finally coming to an end. As and for the reasons provided herein, the respondents are directed to return certain items to the estate of Joseph L. Weddington, Jr., care of Teresa Robinson. But Ms. Robinson's objection to the beneficiary status of the respondents is overruled; I find the respondents are amongst Mr. Weddington's rightful heirs. Ms. Robinson must ensure the respondents are included in the estate and abide by her ongoing duties to probate the estate consistent with Delaware law.

This is my final report.

## I.    BACKGROUND[1]

The final dispute in this action relates to the personal property of the estate of Joseph L. Weddington, Jr. (the "Estate" of the "Decedent"), who died intestate on March 26, 2021.[2] I will begin by walking through the various players involved in this action and the Decedent's vibrant life, before discussing how we got to this contentious litigation, and how this action will, finally, conclude.

### A.    The Decedent's Children

Known by many who loved him as "Jody," the Decedent left behind several people who cared for him. Everyone who testified to knowing the Decedent sung his praises—describing him as a "very kind, very sweet"[3] person, who was an overall "likeable guy."[4] Four people who quite clearly love and cared for the Decedent are

---

[1] The facts in this report reflect my findings based on the record developed at the evidentiary hearing held on June 4, 2025 (the "Hearing"). Citations to the Hearing transcript, Docket Item ("D.I.") 221, are in the form of "[First name] [Last name] Tr." referring to the testimony of the identified person, unless the party is otherwise defined herein. Citations to the petitioner's exhibits are in the form of "PX__," and citations to the respondents' exhibits are in the form of "RX__." I grant the evidence the weight and credibility I find it deserves.

At the Hearing I misspoke in admitting three birth certificates into the record as respondents' exhibits "M, N, and O," they are RN, RO, and RP. I also did not expressly admit RD into the record at the Hearing but do so now and will give it the weight and credibility I find it deserves.

[2] D.I. 2.

[3] Debra Michael Tr. 22:21–22.

[4] Petitioner Tr. 113:19–20.

our remaining parties: Teresa Robinson (the "Petitioner"), who also serves as the Estate's administrator, and Danielle Whitaker, Jone Posey, and Paul Whitaker (the "Respondents").

The Petitioner and the Respondents all purport to be the Decedent's children. And they are not alone. The Decedent had several children with different partners. This includes the Petitioner's full brother Joseph Lee Robinson,[5] and her half siblings: Joseph L. Weddington, III; Sharon Weddington; and Robert Weddington. The Petitioner disputes, however, that Mr. Weddington is the Respondents' father.

The Respondents are three of nine children born to Doreen Whitaker, while she was married to Fred Whitaker, Jr.[6] The Respondents' birth certificates list Mr. Whitaker as their father.[7] But each of the Respondents testified that the birth certificates were intentionally inaccurate; they are adamant that everyone knew the Decedent was their father and Fred Whitaker, Jr. was on their birth certificates solely to allow them and their mother to receive his military benefits.[8]

---

[5] *See* Petitioner Tr. 192:4–6 (the Petitioner referring to brother Joseph Lee Robinson). The Petitioner's half-siblings, although not related to the Decedent by blood, described him in loving terms: Patricia, the Petitioner's older sister, described the Decedent as being "like a father figure, and a wonderful, kind human being." Patricia Tunnell Tr. 17:8–18:1.

[6] Jone Posey Tr. 52:16–19.

[7] RXN; RXO; RXP.

[8] *See, e.g.*, Danielle Whitaker Tr. 33:1–7 (explaining that Fred Whitaker is listed on her birth certificate for "the military insurance and all that").

In support of the Decedent's paternity, the Respondents testified at length as to their relationship with the Decedent. The Decedent played a large role at different points in their lives. Entered into evidence were family photos reflecting several purported generations extending from the Decedent to the Respondents and their kin.[9] Per the Respondents, they were a close family unit. For example, Danielle Whitaker testified that, about sixty years ago, the Decedent lived with them as a family.[10] Jone Posey confirmed as much, testifying that the Decedent lived in their house "for at least eight, ten years."[11] She explained that the Decedent was so involved in her life, from the time she was born throughout her teenage years,[12] that she used to sign her name as "Jone Weddington," (*i.e.*, using the Decedent's last name).[13] Sharon Whitaker, the Respondents' sister, also attested to the Decedent's

---

[9] *See, e.g.*, RXE (photo reflecting four purported generations); Jone Posey Tr. 60:3–15 (confirming same); RXF (photo of the Decedent with Jone Posey's granddaughter, Lily, taken roughly twelve years ago); Jone Posey Tr. 60:19–61:4 (confirming same); RXG (photo of the Decedent and his wife with Danielle Whitaker's daughters when they were about eight years old); Jone Posey Tr. 61:5–8 (confirming same); RXH (photo of the Decedent with Danielle Whitaker's grandchildren); Jone Posey Tr. 61:11–12 (confirming same); RXJ (photo of Jone Posey with the Decedent and his wife, taken roughly thirty years ago); Jone Posey Tr. 61:17–62:1 (confirming same).

[10] Danielle Whitaker Tr. 35:21–23; Danielle Whitaker Tr. 31:12–32:1.

[11] Jone Posey Tr. 38:7–11.

[12] Jone Posey Tr. 39:7–9.

[13] Jone Posey Tr. 54:11–14.

role as the Respondents' father, affirming her belief as to the Decedent's paternity and that he lived in their home.[14]

But it was not just the immediate family unit that saw the Decedent as the father of the Respondents; it was also the Decedent's extended family and the family of Fred Whitaker, the man listed on their birth certificate. One of the Decedent's cousins, Verdell Walker, testified at trial that she knows the Respondents as "Jody Weddington's children[,]" noting that she lived about five doors down from the Decedent and the Respondents during the time they lived together.[15] Likewise, Dorothy Bowman, Fred Whitaker's sister, confirmed her long held understanding that her brother was only the biological father of four of Doreen Whitaker's children and that the rest (including the Respondents) were fathered by the Decedent.[16] She knew that from "being together all the time and seeing them at different functions, parties, and whatever, and knowing by them practically . . . living together."[17]

Not only did the Respondents live with the Decedent for some portion of their childhood, but one of the Respondents, Paul Whitaker, also reunited with the

---

[14] Sharon Whitaker Tr. 75:9–76:8.

[15] *See* Verdell Walker Tr. 99:15–23. *See also* Tiarre Whitaker Tr. 110:14–111:2 (explaining that she knew the Decedent as her grandfather); Shaneikqua Harris Tr. 122:3–16 (same).

[16] Dorothy Bowman Tr. 134:12–16.

[17] Dorothy Bowman Tr. 141:12–20.

Decedent in his final days; he moved in with the Decedent as the Decedent neared the end of his life and helped to care for him.[18]

### B. The Estate

The Decedent ultimately passed on March 26, 2021, and his family quickly came together to administer his estate. On May 26, 2021, the Petitioner and Christopher Whitaker petitioned the New Castle County Register of Wills to open the Estate, through counsel, and supported by renunciations from several purported heirs, including the Respondents. In the opening petition, the Petitioner and Mr. Whitaker listed the Respondents as the children of the Decedent and provided their contact information. With a complete packet before them, and seeming consent from the full family, the Register of Wills issued letters on May 27, 2021, appointing the Petitioner and Mr. Whitaker as co-personal representatives.

Sometime early in the administration, the Petitioner distributed various assets of the Estate to different family members, including the Respondents. To the Respondents, she distributed: (1) an approximately 1998 Chevrolet pickup truck, (2) a 1970 Harley Davidson motorcycle, with accessories and pipes, (3) a 2015 Chevrolet Trax, (4) an outdoor shed, (5) a power washer, (6) an air compressor, (7) a 15' trailer with hitch, (8) a 12' trailer with hitch, and (9) and 2'x4' pig roaster (the

---

[18] Paul Whitaker Tr. 149:18–150:13.

"Challenged Items").[19]  It is the Challenged Items the Petitioner now wishes to recoup. And she is doing so as the now sole administrator of the estate. Effective March 9, 2023, after this litigation commenced, Christopher Whitaker resigned as co-administrator.

## II.    PROCEDURAL POSTURE

This action began when the Petitioner and Christopher Whitaker were co-administrators and wished to challenge a purported holographic will. That challenge was resolved, and I enforced the parties' settlement. But as that initial challenge resolved, the dispute over the Challenged Items bubbled up. As early as November 2022, the relationship between the Petitioner and the Respondents began to sour and the Petitioner began to question whether the Respondents were the Decedent's children.[20]

---

[19] The Petitioner also distributed to the Respondents a 1930 Model A antique car frame, with tires, tubes, and other parts for the frame. That distribution is no longer at issue and were resolved outside of the Hearing. *See* D.I. 215 (granting the Petitioner's request to dismiss Christopher from this action); D.I. 217 (confirming my expectation that Christopher was dismissed from the action and would uphold his end of their agreement to return the antique car frame and related items in his possession); D.I. 219 (letter from Christopher confirming his agreement to "return the antique Model A car frame and all related accessories and parts" and planned to contact the Petitioner "to meet and confer to discuss a process for the return").

[20] D.I. 60–63.

In November 2023, that dispute was first referenced on the docket of this action.[21] The Petitioner attempted, on November 8, 2023, to file a motion against the Respondents to compel their return of the Challenged Items (and other items, which are no longer at issue).[22] In that purported motion, the Petitioner accused the Respondents of lying, concealing their birth certificates, and opportunistically acquiring the high-value assets of the Estate.

But, as I communicated to the Petitioner in my February 16, 2024 letter, her purported motion was procedurally improper.[23] I explained to the Petitioner that she could not add new claims or new parties by way of a purported motion to compel. I also pointed her to Court of Chancery Rule 15 and the Court's best practices for amending pleadings, before denying the purported motion without prejudice to renew as appropriate.[24]

The Petitioner then moved for leave to amend the underlying petition, add the Respondents as parties, and assert claims against them regarding the Challenged Items.[25] On May 7, 2024, I heard argument on and granted that motion and the

---

[21] *Id.*

[22] *Id.*

[23] D.I. 116.

[24] D.I. 119.

[25] D.I. 120.

amended petition was filed shortly thereafter, on May 10, 2024.[26] When the Respondents delayed in responding to the amended petition, the Petitioner moved for judgment by default.[27] I expressed my concerns and expectations to the Respondents both by letter on September 4, 2024 and at the October 3, 2024 hearing on the default motion.[28] Nevertheless, because the Respondents did eventually answer the petition in a self-represented capacity, I granted them some leniency, denied the default motion, and decided to hear the claims in the amended petition on their merits.[29]

On January 10, 2025, I granted the Petitioner's uncontested request to file a second amended petition, which she filed on January 30, 2025, and which is now the operative pleading (the "Petition").[30] Through the Petition, the Petitioner seeks five forms of relief: (1) injunctive relief requiring the Respondents to return of the Challenged Items, (2) declaratory judgment that the Respondents are not entitled to reimbursement for the cost of retitling certain assets, (3) declaratory judgment that the Respondents are responsible for any diminution in value of the Challenged Items,

---

[26] D.I. 148–149, 151.

[27] *See* D.I. 156.

[28] D.I. 160, 168.

[29] *See* D.I. 161, 163, 168.

[30] D.I. 180, 181.

(4) damages against the Respondents and in favor of the Estate for any of the Challenged Items that are no longer in the Respondents' possession, and (5) court approval for a sale of the Estate's assets for payment of the Estate's debts.

On February 4, 2025, I scheduled the Petition for an evidentiary hearing on June 4, 2025.[31] I resolved some pre-hearing matters by letter reports on May 28, and 30, 2025, and, ultimately, the hearing went forward as scheduled.[32] I took this matter under advisement and hereby issue my final report.

## III. ANALYSIS

The primary issue before me is whether the Respondents should be compelled to return the Challenged Items so that they can be sold to pay the debts of the Estate. The answer to that question is "yes." But that "win" is not for the reasons advocated for by the Petitioner. The Petitioner sought this relief largely premised on her belief that the Respondents are not the Decedent's children. But their relationship to the Decedent is not dispositive on whether the Challenged Items must be returned. That question is a simple one of proper estate administration, and after balancing the equities, I decline to order any cost shifting or other financial offsets.

---

[31] D.I. 182.

[32] D.I. 215, 217.

Having refocused this action under applicable Delaware law, I need not tread into paternity to address the return of the Challenged Items. But declining to do so would ignore a true and urgent dispute amongst the parties. The Petitioner, as the sole administrator of the estate, firmly believes the Respondents are not the Decedent's heirs. The Respondents challenged that and asserted their interests with supporting evidence at our evidentiary hearing. I would be remiss not to answer this joined issue and allow uncertainty to continue. Thus, I do herein address paternity and find the Respondents have sufficiently established their relationship to the Decedent such that they should be treated as heirs of his estate. The Petitioner shall respect and account for their interests in her capacity as the Estate's administrator.[33]

Finally, I address and deny the Petitioner's request for additional shifting of fees and costs.

## A. The Respondents must return the Challenged Items to the Estate.

Whether or not the Respondents are the Decedent's heirs, the Challenged Items must be returned to the Estate. The Petitioner's premature distribution of the

---

[33] In addition to countering the Petitioner's claims, the Respondents advocated at the Hearing for a DNA test from all alleged siblings to determine the Decedent's parentage. Jone Posey Tr. 227:20–228:5. *See also* D.I. 193 (informally raising the DNA request in a letter submission to the Court). This request was not pled in response to the Petition, is procedurally improper, and is denied, without prejudice to renew in an appropriate forum, through proper procedure.

Challenged Items was improper and must be unwound. Finding both sides share the blame for the escalation of this issue, I decline to shift the related costs.

"Under estate law, [t]he purposes of administration are to collect the assets of the decedent, pay his or her debts and expenses, and make distribution to the persons entitled thereto, and to do so in an orderly, expeditious, and efficient fashion."[34] Delaware law requires that the administration of an estate proceed in that order— collect, pay, and distribute. To that end, the administrator, once and as appointed, "is invested with the legal ownership of all the goods and chattels, rights and credits which belonged to the deceased at the time of his death."[35] That interest comes with the duty to marshal and protect the estate assets, and only "after completing an inventory of the personal property, . . . sell the movable property when necessary, pay the debts due from the estate and distribute the surplus, if any, according to law."[36] "Personal representatives who make voluntary distribution amongst next of kin do so at their own risk."[37] And "if the estate is distributed to the wrong parties, even though distribution is made in good faith, the personal representative may be

---

[34] *Gurney-Goldman v. Goldman*, 321 A.3d 559, 585 (Del. Ch. 2024) (internal citations omitted).

[35] *Fid. Ins. Tr. & Safe Deposit Co. v. Niven*, 1880 WL 2695, at *11 (Del. June 1880).

[36] *Id.*

[37] *Madden v. Phelps*, 1995 WL 606318, at *5 (Del. Ch. May 15, 1995) (citation modified).

personally liable."[38] But this Court, as a court of equity, will refuse relief in favor of parties whose "own acts offend the very sense of equity to which [they] appeal[]."[39]

Here, the Petitioner failed in her duty to marshal and protect the Estate's assets. She prematurely distributed or allowed the Respondents to take possession and claim ownership over the Challenged Items. The Challenged Items must be returned to the Estate. And I will give the Respondents 30 days from the date of this final report to do so.

I decline, however, to shift any costs associated with that return or require repayment for diminution in value. The Petitioner was wrong to distribute or allow these assets to go outside the Estate, but the Respondents were also wrong in refusing to return the assets upon request/demand. Neither side comes to this Court with clean hands, nor has either demonstrated entitlement to cost shifting. There is also no record before me that any of the Challenged Items have been damaged or diminished in value to a material extent. I will not, therefore, order any prospective, hypothetical relief. The Challenged Items must be returned and may then be sold by the Petitioner

---

[38] *In re Johnson*, 1997 WL 599519, at *2 (Del. Ch. July 17, 1997). *See, e.g.*, *In re Estate of Solberg*, 2024 WL 5379574, at *9 (Del. Ch. Feb. 5, 2025) (surcharging a personal representative for funds where they were transferred post-death and should have been recouped by the personal representative as estate assets).

[39] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998).

to pay the debts of the Estate. The Petitioner shall account for these assets as directed by the Register of Wills.

### B. The Respondents have established that the Decedent is their father by a preponderance of the evidence.

As explained, I could stop here, having answered the primary question before me. But the parties have joined issue on paternity and there is a live controversy about the Respondents' potential inheritance from the Estate. It would be a disservice not to address this issue and provide the parties with an answer. My answer, based on the evidentiary record before me, is that the Respondents are the Decedent's heirs, because they have demonstrated paternity by a preponderance of the evidence.

The Decedent passed without a valid will, meaning the Estate will pass by Delaware's statutory scheme of intestate succession. Under 12 *Del. C.* § 503, in relevant part, when a decedent has no surviving spouse, the entire intestate share passes to "the issue of the decedent, per stirpes." Under Section 508, paternity for estate purposes need only be demonstrated by a preponderance of the evidence.[40] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to

---

[40] 12 *Del. C.* § 508(3)(a)(2).

it, has the more convincing force and makes you believe that something is more likely true than not."[41] The Respondents, thus, bore the burden of proving that the Decedent is, more likely than not, their father. They met that burden.

The Respondents' evidence, including their photos, testimony, and the testimony of other relatives and neighbors painted a persuasive picture of the Decedent's paternity. To counter that, the Petitioner relied almost exclusively on the Respondents' birth certificates. But birth certificates are not dispositive.

Rather, this Court, in *Estate of Koon*, previously found that parentage was established by a preponderance of the evidence, despite a conflicting birth certificate.[42] In *Koon*, the Court credited evidence that (1) the child in question lived on the same street as the alleged father's family and was cared for by his family and others while his mother was working, (2) his mother would suggest that he call the alleged father, who also occasionally sent him money and gifts, and (3) a woman who identified herself as the child's aunt was in contact to let the child know that his father had died.[43] Although the Court acknowledged the "contrary evidence" on the

---

[41] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *48 (Del. Ch. Feb. 12, 2018), *rev'd in part on other grounds sub nom., Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 204 A.3d 482 (Del. 2019) (quoting *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)).

[42] 1984 WL 136929 (Del. Ch. Dec. 11, 1984).

[43] *Koon,* 1984 WL 136929, at *1.

child's birth certificate, which listed another man, and testimony from the alleged father's brother that he believed the child was his son but he was "not too right in the head[,]" the Court concluded that the preponderance of the evidence supported a finding of parentage.[44]

Here, the record is even greater. Witnesses in this action presented credible evidence that the Decedent claimed the Respondents as his children, spent time and money on them and their children, and was present and involved as a parent at various points throughout their lives. The Respondents also offered a consistent and candid explanation for why another man was listed as their father on their birth certificates. The preponderance of the evidence before me supports that the Respondents are, more likely than not, the Decedent's children. They are, thus, intestate heirs of the Estate.

### C.    The Petitioner's request for fee and cost shifting is denied.

Finally, the Petitioner asks for reimbursement of her fees and expenses. As she coined it at the Hearing, the Petitioner asks that her fees and costs be reimbursed because of the Respondents' "intentional evading of their responsibilities in this legal process."[45] I treat that as a request for fee shifting under the bad faith exception

---

[44] *Id.*

[45] Petitioner Tr. 221:18–21.

to the American Rule. I find no evidence of bad faith and thus decline to shift fees. Because she is not the "prevailing party," I also reject the Petitioner's request for costs.

"Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court."[46] "The bad faith exception to the American Rule applies in cases where the court finds litigation to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs of litigation."[47]

This Court does not, however, lightly shift fees under the bad faith exception. "A party seeking to shift fees must satisfy the stringent evidentiary burden of producing clear evidence of bad faith."[48] "To capture the sorts of vexatious activities that the bad-faith exception is intended to address, this court employs the 'glaring egregiousness' standard."[49] The Petitioner failed to prove that the Respondents engaged in the requisite glaringly egregious conduct.

---

[46] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005).

[47] *Id.* at 850–51.

[48] *Myers v. Acad. Sec., Inc.*, 2023 WL 6380449, at *1 (Del. Ch. Oct. 2, 2023) (ORDER), *adopted*, 2023 WL 6846984 (Del. Ch. Oct. 16, 2023) (citation modified).

[49] *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, at *6 (Del. Ch. July 7, 2023).

Nor is the Petitioner the prevailing party. Under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." This Court has defined a prevailing party as "the party who successfully prevails on the merits of the main issue or on *most* of her claims."[50] Here, there is no prevailing party. I am ordering the Respondents to return the Challenged Items, which they have so far refused to return. But the Respondents only have possession of the Challenged Items because of the Petitioner's improper administration of the Estate. And, although the Respondents prevail on the merits of the paternity issue, it was not the main issue before me. On this mixed result, in this hotly contested litigation, I decline to shift costs under Rule 54(d).

## IV. CONCLUSION

For the reasons explained above, the Respondents must return the Challenged Items to the Estate, care of the Petitioner, within 30 days. Under Delaware law, the Petitioner may sell those items to pay the Estate's debts and must account for such through, and as directed by, the Register of Wills. The parties shall personally bear all fees, costs, and expenses incurred in these proceedings. The Petitioner must also ensure the Respondents are included as intestate heirs of the Estate as she moves

---

[50] *Adams v. Calvarese Farms Maint. Corp.*, 2011 WL 383862, at *3 (Del. Ch. Jan. 13, 2011) (emphasis in original).

forward with probate. With these issues resolved, the Estate should be moving promptly toward final distribution.

This is a final report, and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

*/s/ Selena E. Molina*

Senior Magistrate in Chancery